TRIANGLE CONDUIT & CABLE CO., Inc., v. NATIONAL ELECTRIC PRODUCTS CORPORATION.

Civil Action No. 196.

District Court, D. Delaware.

July 21, 1944.

See also 38 F.Supp. 533.

E. Ennalls Berl, of Wilmington, Del., and Samuel E. Darby, Jr., Floyd H. Crews, and Louis D. Fletcher, all of New York City, for plaintiff.

Hoxie & Faithfull, John Hoxie, and George E. Faithfull, all of New York City, and Marvel & Morford, of Wilmington, Del., for defendant.

KIRKPATRICK, District Judge.

The plaintiff makes certain types of electrical wire and cable covered by a number of the defendant's patents. It began this action for a declaratory judgment to establish the invalidity and noninfringement of the patents and the defendant counterclaimed for infringement. As the case now stands, six patents, which fall into three groups of two each, are involved. As to each, the only issue is validity, because, if valid, the plaintiff clearly infringes them all.

### 1. The Serving Patents.

The first two patents, Robinson and Moore, Nos. 2,222,555 and 2,222,556, have to do with insulated electrical building wire. This type of wire is usually installed by being drawn into conduits previously located in the walls, floors and ceilings, ordinarily without being assembled into a cable. The general construction of the insulating and protective covering of such wire is practically standard and consists of (1) an insulating coating of rubber next to the wire, (2) a fibrous covering of some kind saturated with an asphaltic compound to give it moisture resistance, (3) a layer of flame resistant stearin pitch, (4) a thin wax coating to make it easier to draw or "fish" the wire into the conduits.

These two patents are directed specifically to the fibrous covering. They claim, in combination with the other elements of the wire as above described, what amounts in substance to a serving consisting of a number of cotton threads wound helically around the rubber to form a close wrapping and secured by a binder thread oppositely wound. In the second patent the binder thread is made of a particular type of material, the specification mentioning rayon as an example. The major elements of the combination are all old. The alleged patentable improvement claimed is the use of the binder thread, which the patent describes as a "locking filament." Its purpose is to keep the separate strands of the serving from separating or opening up and cracking the outer coating when the wire is sharply bent or kinked. My observation from courtroom experiments is that in the case of bends in the wire permitted by practice and regulation and ordinarily encountered in construction work, there is no noticeable difference in this respect between wire with the binder thread and that without it. On the outside of very sharp kinks the serving without the binder thread spreads more than that with it, but the difference is not great.

A British patent (Roberts No. 242,911) of 1925 discloses the use of an oppositely wound binder thread to hold in place helically wound strips (servings) of insulating paper, wrapped around an electric cable. The conductor in the Robinson patent is a cable instead of a single wire and there are two layers of the insulating paper, but these differences are concededly immaterial. The paper strands of the Roberts patent have a considerable pitch, that is, they lie more nearly parallel with the wire than the cotton servings of the Robinson and Moore patents. Upon this distinction alone, the defendant, in order to avoid complete anticipation, proposes the theory that Roberts' use of the binder thread was for an entirely different purpose from that of the patent. He argues that, since the greater pitch of the serving of the Roberts' patent would, in itself, prevent separation

in the finished product, the purpose for which the binder was supplied must have been to prevent the bulging out or ballooning which might occur during the process of manufacture. Although the Roberts patent gives no hint of all this, it could be accepted without avoiding anticipation. It does not change the fact that, in both the Roberts patent and the patents in suit, the purpose of using an oppositely wound binder thread is the same, namely, to prevent the strands of the serving from coming apart when subjected to a force which tends to separate them. Roberts discloses this use and indeed it is so elementary that it hardly needs a prior art patent to show it. I am unable to see how the fact that a subsequent patentee uses this simple and well-known means of combatting a particular condition (bending of the wire in use), which Roberts may or may not have foreseen, constitutes novelty.

Even assuming novelty, the improvement can hardly involve invention. The defendant attempted to predicate invention upon evidence of the solution of a problem in the art and of a degree of commercial success which appears impressive enough until the peculiar situation in the industry is understood.

■ Before the plaintiff's patent was applied for, the fibrous covering was usually made of braided cotton thread. That type complied with standards set by the National Board of Fire Underwriters. It was more expensive than merely wrapping parallel cotton threads around the rubber. The defendant attempted to get the Underwriters to approve an unbraided wrapping, but they refused to do so until it had supplied the binder thread, after which the wire was passed.

Of course, in the electric and building trades the cheapest construction which will get by the Underwriters is bound to have commercial success. When a thing is "good enough" a contractor will ordinarily use it in preference to something more expensive. Various tests by the Underwriters showed the defendant's covering to be inferior to the braided kind in almost every way. The Underwriters, however, considered it safe and satisfactory and passed it. Had they not done so it would have been practically useless. "Commercial success" in this case, therefore, means nothing more than the approval of the Underwriters—a body whose judgment is entitled to great respect—but it is not the kind of commercial success which can be accepted as evidence of invention. The only problem solved was the problem of getting the Underwriters to approve something cheaper than was previously in use.

I therefore find that patent No. 2,222,555 invalid, first because anticipated by Roberts' British patent and second, if not fully anticipated, then because such slight and immaterial novelty as it presents does not involve an inventive advance.

The second Robinson and Moore patent No. 2,222,556 falls with the first. Even if the first were valid, the selection of such a well-known material as it describes could not, in my judgment, possibly constitute invention.

## 2. The Crumpled Paper Patents.

■ The next two patents, Frederickson No. 1,828,772 and Fullman No. 1,863,-979, have to do with cables (a term applied to an assembly of wires held together in some way) and in particular with nonmetallic sheathed cable of a type developed about 20 years ago, using paper armor. It consists of rubber covered wires, two, three or four in number, each of which is surrounded by paper wrappings, the whole being covered with an outer covering of fire-resistant compound. The paper covering for the wires protects the rubber insulation from hammer blows and other knocks and also spaces them apart so that a nail driven through the cable may miss the wires.

Ever since the development of this type of cable the practice has been to use paper strips spirally wrapped. As far back as 1891, patent No. 459,378 to McCracken shows the use of twisted ribbons of paper spirally wound upon an electrical conductor and surrounded by insulating and sealing waterproof compound. He points out that "Where the wires are laid up in cables the individual wires may be first so treated * * *" although that suggestion does not seem to have borne fruit until much later.

The defendant argues that McCracken does not anticipate because the paper strips of the McCracken patent are twisted before being wrapped around the conductor. In the words of the defendant's brief; "This is neither an anticipation of the Frederickson idea nor a guide to it, because a 'twisted' strand (even loosely twisted) 'more or less loosely', is not the same thing as an untwisted crumpled pa-

per strand, tightly wrapped and laid on with an overlap of the turns."

It may not be exactly the same thing, but in my judgment, it comes so close to it that if not a complete anticipation, at least it is a disclosure over which no patentable novelty is shown by the Frederickson patent. The defendant adds, "twisting does not suggest crumpling." It seems to me that it does, and that a twisted strip of paper is most certainly crumpled, although it may be that a crumpled strip is not always twisted. Frederickson did not seem to think that the two ideas were mutually exclusive for he says in the specification that his precrumpled strips may "have a few twists to help in the formation of the strand."

The claims of the Frederickson patent specify that the coils be made of "thin soft paper" or "soft readily compressible paper"—an idea by no means excluded by McCracken which merely calls for ribbons of paper, by preference, dampened so that the strands may have more or less elasticity and may be readily twisted into the preferred loose rove-like condition., Perhaps the defendant's twist is not quite as hard a twist as that which McCracken describes, but I do not think that McCracken's defeats the main purpose of getting overlap continuity and softness when the strand is wrapped on the wire. The McCracken patent does plainly state that the different ribbons or twists in his construction are "more or less interlocked" and I am frankly unable to follow the defendant's argument that McCracken's overlapping is not a "real and assured overlap," not the "deliberate overlap" of Frederickson.

The Fullman patent No. 1,863,979, although the specification describes apparatus in great detail, claims a method and nothing else. The method is intended to produce the crumpled paper armored wire of the Frederickson patent just discussed. It consists of three steps: (1) Crumpling strips of paper. (2) Wrapping it around the wire spirally in non-overlapping coils. (3) Compressing the coils tightly upon the wire and upon each other.

It seems hardly necessary to do more than refer to the McCracken patent just discussed to see that the Frederickson patent, if not completely anticipated, shows no inventive advance over the prior art. The McCracken patent contains a method claim and the specification describes, (1) twisting, "not carried to such an extent as to form a hard paper cord but * * * only carried sufficiently far to form a loose twisted body." Parenthetically, although McCracken does not use the word "crumpled," the loosely twisted ribbon which he describes must be crumpled, though perhaps not to the extent produced by the Fullman method. (2) "Spirally winding" the ribbon "around the conductor." (3) "The conductor thus insulated would by preference and as commonly practiced be passed through a die to more or less compact the paper upon the wire and give it a uniform cross-section * * *. The paper * * * being pressed into position by the die, the different ribbons or twists are more or less interlocked * * *." This patent was not cited against Fullman in the Patent Office. If it had been, I do not see how the Fullman patent could have issued.

### 3. The Paint Patents.

The last two patents, Murphy No. 1,798,486 and Bockus No. 1,765,000, deal with the coloring of the wires for the purpose of identifying different ones as belonging to different circuits. The defendant presents the matter of coloring the wires as a great problem in the industry. No doubt difficulties were encountered when the type of protective covering which included black sticky pitch with a wax coating came into general use. Murphy contributed what the defendant refers to as "a generic idea" by proposing painting the pitch compound covering and applying the wax coating over the paint. No inventive concept could be involved in the idea of painting a surface to be waxed, before putting on the wax, and I would be very much inclined to say that the Murphy patent is invalid on its face. At any rate, as claimed and described it was wholly lacking in utility because it claimed merely paint or coloring matter and pointed out that any good grade of paint would do. The fact was that any good grade of paint would not do and of course the art remained in exactly the same state after Murphy's patent as before it, because it had always been perfectly evident that you can not paint a black stearin pitch surface satisfactorily with any good grade of white paint. As the defendant pointed out, the color coating has to be very thin, flexible, coherent and permanent; most paints, such as Duco, will not do; they mix with the

paint, or the pitch blends into the paint and the result is bad.

The defendant's claim for the Bockus patent is that it supplies the art with the right kind of paint. The "improved compound" which he refers to is simply spirit varnish paint, a well-known type of coloring material. It is conceded (or if not conceded, established by the evidence) that the formula given by way of example in the Bockus specification is not new, either. Consequently, the invention is said to reside not in the coloring matter described but in the alleged discovery that this particular coloring material could be combined with the pitch coating on a wire, with satisfactory results.

It should be pointed out that the claims are broad enough to cover all types of spirit varnish paint. Some of them add other ingredients such as a plasticizer and/or coal tar derivatives. It is also undisputed that types of spirit varnish coming entirely within the claims, would be useless. Passing the plaintiff's argument that the patent is invalid because the claim is thus broader than the invention, and assuming that the illustration of the specification is a satisfactory spirit varnish paint, I am clearly of the opinion that the patent lacks invention, and, in spite of the brief period of fumbling about while the defendant was trying to hit upon the right kind of paint to use, I accept the testimony of the plaintiff's witness to the effect that a paint chemist (a type of consultant who was not called in by the defendant) would readily understand the nature of the problem and apply the proper kind of paint to overcome it. I cannot but feel that the matter of finding a paint which would make a good coloring material for a wire treated with stearin pitch was not one of exceptional difficulty and that the selection of such a large and well-known class of paints as spirit varnish paints and determining those of them which would be satisfactory, did not require the use of the inventive faculty.

The statements of fact contained in the foregoing opinion may be taken as special findings and the statements of law as conclusions of law.

I find as a fact that all six patents if valid would be infringement by the plaintiff.

My final conclusion of law is that all six patents are invalid.

Judgment accordingly.